# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____ :
                                   :

**THE RESIDENCES AT BAY POINT**    :
**CONDOMINIUM ASSOC., INC.,**      :
                                   :      **Civil Action No. 16-5190 (MCA) (MAH)**
            **Plaintiff,**           :
                                   :
         **v.**                        :
                                   :
**CHERNOFF DIAMOND & CO., LLC,**   :
**et. al,**                                 :      **OPINION**
                                   :
          **Defendants.**         :
_____:

**HAMMER, United States Magistrate Judge**

      This matter comes before the Court on the motion of Defendants, The Residences at Bay Point, LLC, Albert Dweck and David Schwartz, to disqualify Plaintiff's counsel, Louis J. Lamatina, Esq. See Mot. to Disqualify, D.E. 44. Defendant Chernoff Diamond & Co., LLC, joins in Defendants' motion. Plaintiff opposes the motion. D.E. 50. The Court held oral argument on May 5, 2017, and required the parties to submit supplemental briefing on the movants' arguments under New Jersey Rules of Professional Conduct 1.7(a)(2) and 1.8(i). The Court has considered the parties' submissions, the oral argument, and the law. For the reasons set forth herein, the Court will deny the motion.

## I.     <u>BACKGROUND</u>

      This case stems from a flood insurance claim made by Plaintiff, The Residences at Bay

Point Condominium Association ("the Association") for flood damage occurring in the aftermath of Superstorm Sandy in October 2012. <u>See</u> Compl. ¶¶ 15 to 18, Ex. 1 to Not. of Removal, D.E. 1-1. The Association is a "New Jersey not-for-profit corporation…entrusted with the management of the premises known as The Residences at Bay Point ("The Residences"). <u>Id.</u> ¶ 8. The Residences is a forty-eight-unit, "residential condominium complex located at 320 Maryland Avenue, Point Pleasant Beach, New Jersey." <u>Id.</u> Defendant, The Residences at Bay Point LLC, is the Sponsor of the condominium ("the Sponsor"), meaning that it is the entity which purchased the property and converted it to the condominium form of ownership. Compl. ¶ 10. Defendants Albert Dweck and David Schwartz are managing members of the Sponsor. <u>Id.</u> ¶ 7. The Residences at Bay Point, LLC, Dweck, and Schwartz shall be collectively known as "the Sponsor Defendants." Dweck and Schwartz were also members of the Plaintiff's Board of Directors by virtue of the Sponsor's ownership of eighteen of the units, with Dweck serving as President of the Board at or around the time of Superstorm Sandy. Declaration of Albert Dweck ("Dweck Decl.") ¶ 3, Jan. 13, 2017, D.E. 44-1. [1]

The flood insurance policy in controversy was issued by third party Defendant, The Standard Fire Insurance Company d/b/a Travelers Indemnity and Affiliates ("Standard"). Compl. ¶ 1. Standard acts as an agent of the United States government and issues flood insurance policies administered by the Federal Emergency Management Agency ("FEMA"). <u>Id.</u> ¶ 13. Defendant Chernoff Diamond & Co. ("Chernoff") is an insurance broker and was retained by Plaintiff for the purpose of procuring proper flood insurance coverage for Plaintiff's condominium complex. <u>Id.</u> ¶ 7. The Association's initial Policies with Standard were written on the National Flood Insurance

---

[1] Schwartz discontinued service on the Board of Directors in March 2013. Dweck Decl. ¶ 6.

Program ("NFIP") General Property Form, which provides coverage on an actual cash value basis.[2] Chernoff Compl. ¶ 15, Exh. 3 to Not. of Removal, D.E. 1-3. In or around 2008, Chernoff became the broker of record in connection with the Policies, which were renewed without change. Id. ¶ 16. In 2009, after the Residences became a condominium, the Association requested that the Policies be amended to provide for reimbursement on a replacement cost basis, which Plaintiff alleges would have been the proper type of insurance for a condominium complex. Id. ¶ 17. Thereafter, Chernoff submitted an application to Standard for the policy to be written on the NFIP Residential Condominium Building Association Policy ("RCBAP") form, which provides coverage on a replacement cost basis. Id. ¶ 18. Standard made the requested change. Id. ¶ 19.[3]

Subsequently, the Association, through Dweck, informed Chernoff that it no longer wanted coverage using the RCBAP form. Id. ¶¶ 23-25. Chernoff informed Standard of the requested change, and Standard then re-wrote the coverage back to the General Property Form, meaning that the condominiums were again covered on an actual cash value basis, not on a replacement cash value basis. Id.

It is undisputed that for all relevant time periods, Plaintiff complied with the terms of the General Property policies in place and paid all required premiums. Compl. ¶ 17, D.E. 1-1. However, after Plaintiff notified Standard regarding the extensive damage to the premises as a result of Superstorm Sandy, "Standard subsequently advised of its refusal to honor the policies as

---

[2] Insurance provided on an actual cash value basis allows for the insured to be compensated for the actual cash value of the damaged property at the time of the loss. Thus, if the damaged property had depreciated in value since the time it had first been purchased, the insured would be compensated only for the property at that depreciated value. On the other hand, insurance issued on a replacement cost basis compensates the insured for the actual cost of replacing the damaged property with new versions of the property.

[3] The flood insurance was to have provided coverage to both the individual units as well as the common areas of The Residences. Dweck Decl. ¶ 4.

written and its unilateral decision to 'reform' the policies from the General Property policies it sold to Plaintiff to Residential Condominium Building Association Policies…because General Property policies cannot be issued to residential condominiums." Id. ¶ 19.   Plaintiff alleges that although its damages totaled $602,828.11, Standard paid only $221,131.24. Id. ¶ 20.  Plaintiff also alleges that Standard charged Plaintiff $361,696.87 in "co-insurance penalties" for Plaintiff's failure to obtain the correct insurance, the RCBAP policy, for a condominium property.  Id.

Plaintiff filed a lawsuit against Standard in this Court on April 10, 2013 ("the 2013 action"). See The Residences at Bay Point Condominium Ass'n, Inc. v. Standard Fire Ins. Co. et. al., Civ. No. 13–2380.  Mr. Lamatina represented Plaintiff. [4]  In the 2013 action, Plaintiff alleged that Standard's "unilateral decision to 'reform' the policies from the General Property Policies it sold to Plaintiff to Residential Condominium Building Association Policies" and the subsequent imposition of the co-insurance penalties constituted a breach of the insurance contract. See generally Complaint in 2013 Action, April 10, 2013 ("2013 Compl.").  Plaintiff also named Chernoff as a defendant in the 2013 case, alleging breach of contract and negligence for Chernoff's failure to "procure adequate and applicable flood insurance for the plaintiff." Id.

On January 14, 2014, Plaintiff amended its complaint in the 2013 Action to add the Sponsor Defendants, alleging claims of negligence and breach of fiduciary duty, among other things.  See Sec. Am. Compl. in 2013 Action, Jan. 14, 2014.  Plaintiff alleged that "[d]uring 2009-2010 and through March 2013, Dweck controlled the Association together with the other Sponsor appointed representative on the three (3) member Board, Schwartz."  Id. ¶ 76.  Plaintiff claimed that the Sponsor defendants, in so controlling the Board, failed to procure the proper type of flood

---

[4] No party moved to disqualify Lamatina as counsel for Plaintiff during the entirety of the 2013 Action in this Court.

insurance.  Id. ¶ 83.  Plaintiff alleged that it was Dweck who specifically instructed Chernoff to re-write the policy back to the General Property policies, instead of maintaining the proper RCBAP policies.  Id. ¶ 72.

In August 2014, the Court dismissed all claims against Standard, ruling that the General Property policies that Standard had issued could not be honored as written because the premises had been converted to condominium form of ownership, that Standard correctly reformed the policies to Residential Condominium Building Association Policies, and that Standard properly applied the costly co-insurance penalties.  See Wolfson Opin., Exh. U to Lamatina Decl., D.E. 51-3.  The Court then declined to exercise supplemental jurisdiction over the remaining state law claims, including those made against Chernoff and the Sponsor Defendants, and dismissed the entire action on August 28, 2014.  Id.

On September 25, 2014, Plaintiff filed suit in Ocean County Superior Court, again asserting its state law claims against Chernoff and the Sponsor Defendants for their failure to procure the proper flood insurance for the premises.  See generally Compl., D.E. 1-1.  Plaintiff brought claims of breach of contract and negligence against Defendant Chernoff.  Id. ¶¶ 26-34.   As against the Sponsor Defendants, Plaintiff alleged negligence, breach of fiduciary duty, violation of the Planned Real Estate Development Full Disclosure Act, N.J.S.A. 45:22A-37, and violation of the Consumer Fraud Act, N.J.S.A. 56:8-1.  Id. ¶¶ 35-62.  The Sponsor Defendants then asserted cross claims against co-Defendant Chernoff for indemnification, contribution, and negligence.  See Cross-Claim, Exh. 2 to Not. of Removal, D.E. 1-2.   On July 11, 2016, Chernoff filed a Third-Party Complaint against Standard for claims of contribution, and apportionment of liability as to FEMA.  Chernoff Compl., D.E. 1-3.  FEMA, as a federal agency, removed the case to this Court on August 23, 2016.  Not. of Removal ¶ 4, D.E. 1.

The Sponsor Defendants brought this motion to disqualify on January 13, 2017, more than three years after the Sponsor Defendants were made parties to this lawsuit, and even though Mr. Lamatina represented Plaintiff in the 2013 Action without objection and has represented Plaintiff in this action since its inception. D.E. 44. Chernoff has joined in the Sponsor Defendants' motion to disqualify, but does not assert any additional basis for disqualification than those already advanced by the Sponsor Defendants. D.E. 46.

## II. <u>DISCUSSION</u>

The movants argue that the Court should disqualify Plaintiff's counsel, Louis Lamatina, Esq., for three reasons: (1) the existence of a prior attorney-client relationship between Lamatina and Defendant Dweck; (2) Lamatina has an improper proprietary interest in the current litigation, because he owns, through his family's company, ten of the condominium units at issue here; and (3) Lamatina's status as a necessary witness. <u>See</u> <u>generally</u> Mot. to Disqualify, D.E. 44. The movants' main argument in support of this motion is premised on the existence of a prior attorney-client relationship between Lamatina and Dweck, which the movants argue warrants disqualification under New Jersey Rule of Professional Conduct 1.9(a). <u>See</u> Br. in Supp. of Mot., D.E. 44-2.

### a. <u>Disqualification Based on RPC 1.9</u>

Issues of professional ethics in the District Court of New Jersey are governed by L. Civ. R. 103.1(a). <u>See</u> <u>Carlyle Towers Condo. Ass'n v. Crossland Sav., FSB</u>, 944 F. Supp. 341, 344 (D.N.J. 1996). This Rule provides that "the Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court the Rules of Professional Conduct." <u>See</u> L.Civ. R.

103.1(a). "Thus, to resolve questions of professional ethics, this Court turns to New Jersey's Rules of Professional Conduct." Carlyle Towers Condo., 944 F. Supp. at 345. In this case, the movants mainly rely on New Jersey RPC 1.9, which provides that a "lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client."

"In an application for attorney disqualification…the party who brings a disqualification motion, based on an attorney's successive representations, bears the burden of proving that disqualification is appropriate." Ciba-Geigy Corp. v. Alza Corp., 795 F. Supp. 711, 714 (D.N.J. 1992). The burden in motions of this nature is considered especially heavy because, in this District, "[m]otions to disqualify are viewed with 'disfavor' and disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'" Alexander v. Primerica Holdings, Inc., 822 F. Supp. 1099, 1114 (D.N.J. 1993) (quoting Schiessle v. Stephens, 717 F.2d 417, 420 (7th Cir. 1983)).

Such disfavor results from the unfortunate reality that motions to disqualify are sometimes made solely for "tactical reasons," and that even when they are made in good faith, motions to disqualify cause inevitable delay in the underlying proceedings and create added hardships to the opposing party. Carlyle Towers Condo., 944 F. Supp. at 345 (citing Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 218 (1988)); see also Cohen v. Oasin, 844 F. Supp. 1065, 1067 (E.D. Pa. 1994) (warning that the Rules of Professional Conduct are not indented to be used as a "procedural weapon.") Therefore, Courts are required to balance "the sacrosanct privacy of the attorney-client relationship (and the professional integrity implicated by that relationship) and the prerogative of a party to proceed with counsel of its choice." Schiessle, 717 F.2d at 420; see also In re Cedant Corp. Sec. Litig., 124 F. Supp.2d 235, 249 (D.N.J. 2000) (advising that a court

considering a disqualification motion should "closely scrutinize the facts ... [and] balance the hardships to the client whose lawyer is sought to be disqualified against potential harm to the adversary should the attorney be permitted to proceed").

In the case at bar, the movants allege that Dweck, while serving in his role as a member of the Association's Board of Directors, had an attorney client relationship with Lamatina in this litigation before Dweck, as an individual, was added as a Defendant in the 2013 Action. The movants assert that Lamatina's prior representation of Dweck in this matter runs afoul of New Jersey RPC 1.9(a), which states "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or substantially related mater in which that client's interests are materially averse to the interests of the former client." In support of their motion, the movants rely heavily on Dweck's declaration. <u>See</u> <u>generally</u> Br. in Supp. of Mot. to Disqualify, D.E. 44-2.

Dweck asserts that he first became acquainted with Lamatina in August 2012, at which time Lamatina, through his family's company, Bay Point Investments, LLC, purchased ten condominium units at the Residences. Dweck Decl. ¶ 2, D.E. 44-1. Dweck claims that after Superstorm Sandy hit, he and Lamatina "work[ed] together to have the damage adjusted and submit the claim and…worked together to pursue the initial lawsuit in federal court against the flood insurer." <u>Id.</u> ¶ 4. Dweck alleges that "[t]his joint endeavor had the added aspect that Lou was an attorney and was providing whatever legal services and advice were relied upon." <u>Id.</u> Dweck states that "[d]uring the entire time I was working with Lou on the flood insurance claim, my understanding was that Lou, as the attorney providing legal services to assist the pursuit of that claim, was representing…me and the Sponsor as owner of [a] major share of the units, and the Association and Residences as a whole." <u>Id.</u>

The Sponsor Defendants also assert that Lamatina and Dweck were working together as attorney and client when Lamatina asked Dweck to sign affidavits in support of the Association's opposition to Chernoff's efforts to dismiss the case at some point in the 2013 Action. Exhs. A & B to Dweck Decl., D.E. 44-1. Those affidavits provide very limited and general information about the condominiums, the insurance policies, and the damages suffered from Hurricane Sandy.[5] Id. The movants also point to multiple communications from Lamatina in which Lamatina identified himself as the attorney for the Board of Directors of the Association, of which Dweck was a member. See generally Reply Br. at 1-7, D.E. 62.

Dweck also claims in his declaration in support of this motion that he conveyed important communications to Lamatina prior to this Dweck's inclusion in this litigation, which evidence the existence of an attorney client relationship. Dweck Decl. ¶¶ 4, 9-11 Dweck states that he "discussed with Lou my entire history of transactions with Chernoff concerning the purchase of property and flood insurance for the Residences over the years since Chernoff had taken over as the broker which I believe was in 2008…[and] it was my understanding that I was providing this information and having these discussions in the context of an attorney-client relationship." Dweck Decl. ¶ 4. The movants claim that these communications were significant because the they believe that the information Dweck provided to Lamatina in relation to his history of transactions with Chernoff is "being used against them" in the present lawsuit, insofar as Lamatina, as counsel for

---

[5] In the affidavits, Dweck lists the dollar amount of damages each unit suffered, the amount Standard had paid to date on the policies, and the square footage of each of the units. Exhs. A & B to Dweck Decl. Dweck also explains that after Hurricane Irene in 2011, a claim was "submitted under the General Property policies issued by Standard Fire, which was paid without incident." Exh. A. ¶4. He states that it "was only after the submission of the pending claim at issue in this matter that Standard Fire determined that it was necessary to 'reform' the policies." Id. The affidavits do not go into any further detail beyond this.

the Association, is claiming that the Sponsor defendants controlled the Association's Board of Directors and "caused it to buy the wrong insurance." Br. in Supp. of Mot. at 9-10, D.E. 44.

Lamatina, relying heavily on his own declaration, disputes Dweck's characterization of their relationship. See generally Lamatina Decl., 50-1. Lamatina claims that from the inception of the first lawsuit filed against Standard and Chernoff in early 2013, it was "abundantly clear to Dweck, a sophisticated real estate investor, founder and CEO of his own firm that I represented the Association, and not him or his limited liability company." Id. ¶ 4. Lamatina points to a resolution drafted by the Association's Board, and the subsequent Retainer agreement, both executed in early 2013, which identified Lamatina as counsel for the Association and its Board of Directors only. See Exh. K to Lamatina Decl., D.E. 51-2. ("Be it resolved that the Board of Directors of the Residences at Bay Point Condominium Association, Inc. has met on March 2013 and resolved to retain the Law Offices of Louis J. Lamatina as General Counsel to the Association and to represent the Board in litigation matters including the litigation against Standard"). Furthermore, Lamatina emphasizes that his interactions with Dweck were only in Dweck's "capacity as a member of the Board of Directors of the Association," rather than in Dweck's personal capacity. Id. ¶ 25.

Lamatina also refutes the movants' contention that Lamatina used information disclosed by Dweck as the basis for the present lawsuit against the Sponsor Defendants. Lamatina alleges that he learned of the fact that Dweck directed Chernoff to purchase the wrong insurance by way of an affidavit submitted in the 2013 action by Chernoff's representative, rather than through any confidential communications occurring between Lamatina and Dweck. Lamatina Decl. ¶ 25. [6]

---

[6] Lamatina explains that in the 2013 Action, Standard filed a motion to dismiss the Complaint, and Chernoff, as a cross-defendant, submitted an affidavit of its member Michael Aronson ("the Aronson Affidavit"), as part of its opposition to Standard's motion. Lamatina Decl.

Based on this information, the Court must determine whether a prior attorney-client relationship existed between Lamatina and Dweck in this litigation. If the answer to this threshold question is no, then the Court need not look any further in analyzing whether disqualification is warranted under NJRPC 1.9. See Host Marriott Corp. v. Fast Food Operators, 891 F. Supp. 1002, 1007 (D.N.J. 1995) (finding that disqualification under RPC 1.9 requires the existence of a prior attorney client relationship).

An attorney-client relationship can be express or implied. Because the movants do not argue that there was an express attorney-client relationship between Dweck and Lamatina, the Court's analysis will focus on whether the movants can carry their burden of establishing the existence of an implied attorney-client relationship. "To establish an implied attorney-client relationship 'a party must show (1) that it submitted confidential information to a lawyer, and (2) that it did so with the reasonable belief that the lawyer was acting as the party's attorney.'" Montgomery Academy v. Kohn, 50 F. Supp.2d 344, 350 (D.N.J. 1999) (quoting Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc., 657 F. Supp. 1486, 1495 (N.D. Ill. 1987)).[7] To

---

¶ 21. The affidavit "implicated Dweck and the sponsor defendants, blaming the Association for not having the proper insurance in place [and] squarely blam[ing] the failure on Dweck, who was running the Association during the time the policies at issue were renewed." Id. The Aronson Affidavit included an email from Dweck to the Chernoff representative in which Dweck declined to replace the existing, and improper, insurance policies for the premises. See Aronson Decl., Exh. A to Lamatina Decl., D.E. 51-1.

Dweck's decision to not buy the proper flood insurance is the basis of Plaintiff's case against the Sponsor Defendants. Lamatina claims that Dweck never shared this error with the Association and that this inculpatory information only came to light "by way of public record" upon the filing of the Aronson Affidavit. Lamatina Decl. ¶ 25. According to Lamatina, the information revealed through Aronson affidavit, rather than any communications between Lamatina and Dweck, was the "genesis for the Board of Directors' decision to add him and the Sponsor defendants to the lawsuit." Id.

[7] Although the Sponsor Defendants relied on Montgomery Kohn, 50 F. Supp. 2d 344 in their moving brief, they changed course in their reply brief, arguing that the conveyance of confidential information to an attorney is not necessary to establish the existence of an attorney client

establish the existence of an implied relationship, the party seeking disqualification must show more than his or her subjective belief that the relationship existed. See Ellis v. Ethicon, Inc., Civ. No. 05-726, 2005 U.S. Dist. LEXIS 25705 (D.N.J. Oct. 27, 2005). That party also must show, and the court must conclude, that the moving party's belief in the attorney-client relationship was "objectively reasonable under the totality of the circumstances." Id. at *12-13.

Judges within this District have previously opined on the issue of implied attorney-client relationships in the context of RPC 1.9 on multiple occasions. In Montgomery Academy, Defendant, Ms. Kohn, founder of Plaintiff Academy, allegedly shared confidential information with Plaintiff's counsel, Ms. Weeks, prior to Weeks's retention as counsel for the Academy. Kohn moved to disqualify Weeks, alleging that she had shared information with Weeks regarding "nonfeasance for failing to exercise her fiduciary obligations" in relation to improper investments of the Academy's pension funds. Montgomery Academy, 50 F. Supp.2d at 350. The Court, after holding an evidentiary hearing, granted Kohn's motion, finding that there was "uncontroverted evidence" that Kohn had shared confidential information with Weeks regarding Kohn's improper investments. Id. at 351. The Court also found that Kohn's belief that Weeks jointly represented both the Academy and Kohn was reasonable, because the interests of Kohn and the Academy were aligned insofar as both parties sought to recoup lost investment funds. Id.

---

relationship. Moving Br. at 15-19, D.E. 44-2; Reply Br. at 7-8, D.E. 62. For this proposition, the Sponsor Defendants rely on the New Jersey Supreme Court case Twenty-First Century Rail Corp. v. New Jersey Transit Corp. 210 N.J. 264 (2010). But the Sponsor Defendants' reliance on Twenty-First Rail Corp. is misplaced. That decision did not discuss whether a prior implied attorney client relationship existed between Defendant's attorney and the Plaintiff. In fact, it was undisputed that defense counsel and the plaintiff previously entered into a retainer agreement in the same litigation before Defense counsel switched sides and began representing the Defendant. Id. at 267. The existence of the retainer agreement likely obviated the need for the Court to even consider whether there was an implied attorney-client relationship.

In <u>Killion v. Coffey</u>, Civ. No. 13-1808, 2014 WL 2931327 (D.N.J. June 30, 2014), the Court found no attorney-client relationship warranting disqualification. In that case, defendants, members of a labor union, moved to disqualify counsel for plaintiffs, who were members of the same labor union. Defendants argued that an implied attorney-client relationship existed with plaintiffs' counsel. Plaintiffs' counsel served as general counsel for the labor union, based on a legal services agreement executed prior to the relevant litigation. The legal services agreement allowed union members to seek legal services from the union counsel for "questions relating to the performance of their duties and/or potential employment and/or disciplinary matters." <u>Id.</u> at *1. The Court rejected defendants' arguments and declined to disqualify plaintiffs' counsel. The Court reasoned that the legal services agreement merely made the union members eligible for legal services. But the Court concluded that the movants never sought actually sought the union counsel's services prior to the litigation, and never revealed any confidential information to her, and therefore no attorney-client relationship was ever formed. <u>Id.</u> at *4. The Court also noted that although the movants had sought plaintiff's counsel's services after the start of the litigation, plaintiffs' counsel declined to provide them with representation. <u>Id.</u> at *5.

In <u>Oestreicher v. Rutgers</u>, Civ. No. 02-959, 2015 WL 6460423 (D.N.J. Oct. 26, 2015), the Court found that no implied attorney-client relationship had formed between the plaintiff-students and counsel for defendant Rutgers, despite the fact that Plaintiffs had been witnesses for Rutgers during a dismissal hearing for a professor alleged to have acted inappropriately towards Plaintiffs and other students. The Court noted that plaintiffs failed to prove they had shared any confidential information with counsel for Rutgers, and that counsel for Rutgers "repeatedly and consistently advised Plaintiffs that they did not represent them, and that they only represented Rutgers." <u>Id.</u> at *7.

After examining the totality of the circumstances in this case, and the governing law, this Court concludes that the movants have not carried their burden of proving that there was an implied attorney-client relationship between Lamatina and Dweck. As explained above, in order to establish the existence of an attorney-client relationship, the movant must first establish the client's submission of confidential information to the attorney. See Montgomery Academy, 50 F. Supp. 2d at 351. The movants have failed to establish the existence of such communications in this case. Dweck claims in his declaration that he "discussed with Lou my entire history of transactions with Chernoff concerning the purchase of property and flood insurance for the Residences over the years." Dweck Decl. ¶ 4. He also states that he disclosed this information "with the understanding that Lou was representing all of the persons and entities having an interest in the flood insurance claim, which included the Sponsor." Id. ¶ 10. Dweck also states that in the context of drafting affidavits in the 2013 action, Dweck provided Lamatina "all the information I had regarding the policies and the history of transactions with Chernoff, since I regarded him as representing my interests as counsel." Id. ¶ 11.

These vague and unsupported statements included in Dweck's Declaration regarding communications allegedly had between Dweck and Lamatina fail to prove that any exchange of confidential information occurred, and therefore are insufficient to justify disqualifying Lamatina as counsel. See Alexander, 822 F. Supp. 1099, 1115 ("the party seeking disqualification must carry a heavy burden and must meet a high standard of proof before a lawyer is disqualified."); see also O Builders & Associates, Inc. v. Yuna Corp. of NJ, 206 N.J. 109 (2011) (affirming the Appellate Division's denial of a disqualification motion when the moving party's submissions' were "unsubstantiated" and made in "the vaguest of terms."). Moreover, Dweck does not identify a single communication that conveyed confidential information to Lamatina. Dweck's "entire

history of transactions with Chernoff" is not, by itself, a confidential communication. At a minimum, Chernoff was a party to those transactions and presumably has similar information. Nothing in Dweck's Declaration further elucidates the substance or specifics of those communications. As such, it is manifestly insufficient to carry the movant's burden of proving the exchange of confidential information. By contrast, in <u>Montgomery Academy</u>, Ms. Kohn was considerably more specific in describing the information she had told the attorney. <u>See</u> <u>Montgomery Academy</u>, 50 F. Supp.2d at 346 ("Ms. Kohm claims that she 'shared with [Ms. Weeks] everything that had gone on and also [her] feelings and [her] concerns and [her] worries. . . . 'During those sessions, I told her everything I knew and remembered concerning my role as Trustee and other relevant facts. We examined all documents and audiotapes of meetings together.'") (brackets in original); <u>see</u> <u>also</u> <u>FMC Corp. v. Guthery</u>, Civ. No. 07-5409, 2009 WL 485280, *5 (D.N.J. Feb. 25, 2009) (holding that broad claims of exchange of confidential communications were insufficient to merit disqualification under RPC 1.9(a)). Accordingly, the Court concludes that movants have failed to carry their burden of proving the first element of establishing an implied attorney-client relationship between Lamatina and Dweck.

Because the movants must satisfy both prongs of the test to establish an implied attorney-client relationship, their failure to prove the exchange of confidential information between Dweck and Lamatina is fatal to their motion. <u>Montgomery Academy</u>, 50 F. Supp.2d at 350 (quoting <u>Pain Prevention Lab Inc. v. Electronic Waveform Labs Inc.</u>, 657 F. Supp. 1486, 1495 (N.D. Ill. 1987) and <u>Guerrero v. Bluebeard's Castle Hotel Inc.</u>, 982 F. Supp. 343, 347 (D. VI. 1997)). In the interests of completeness, however, the Court turns to the second prong. The Court concludes that the movants have not met their burden.

The second step requires the movants to establish that any confidential communications were conveyed with the "reasonable belief that the lawyer was acting as the party's attorney." See Montgomery Academy, 50 F. Supp. 2d at 351. This standard is an objective one, in that the movants must establish that Dwek reasonably believed Lamatina was his attorney. To make this showing, the movants argue that the Association and Dweck had a common interest in recovering flood-insurance money after Superstorm Sandy hit, and until Dweck was added as a Defendant in January 2014. But the mere fact that different parties to a legal dispute have common interests, without more, is not enough to establish an attorney-client relationship. See e.g., Oestriecher, 2015 WL 6460423.

The movants also point to the affidavits that Dweck submitted in the 2013 Action as part of the Association's opposition to Standard's motion to dismiss. But those affidavits provide little, if any insight. The affidavits contain rather general and limited information regarding the condominiums and the damages suffered, and provide scant evidence of an attorney-client relationship. The movants also contend that Lamatina often referred to himself as counsel for the Board of Directors, of which Dweck was a member. See generally Reply Br., D.E. 58. However, the movants fail to point to any instance in which Lamatina referred to himself as counsel for Dweck in his individual capacity, rather than as an attorney for the Association's Board of Directors generally.

On the other hand, the resolution and retainer agreement executed by the Association suggests there was no such attorney-client relationship. See Exh. K to Lamatina Decl., D.E. 51-2. The retainer agreement and resolution clearly indicate that Lamatina was going to serve as counsel for the Association and its Board of Directors only. The resolution states "[b]e it resolved that the Board of Directors of the Residences at Bay Point Condominium Association, Inc. has met on

March 2013 and resolved to retain the Law Offices of Louis J. Lamatina as General Counsel to the Association and to represent the Board in litigation matters including the litigation against Standard." Id. Nothing in the resolution nor the retainer agreement indicates that Lamatina would serve as counsel for Dweck individually. Additionally, although the retainer agreement between Lamatina and the Association provides for a contingent-fee arrangement, there is no evidence of any separate fee arrangement between Lamatina and Dweck. Id.

Additionally, it appears that for a least part of the relevant time period, the Sponsor Defendants, including Dweck, were represented by their own counsel, Mark O'Brien, Esq. Lamatina Decl. ¶¶ 16, 23-24. In emails between Dweck, Lamatina and others dated between January 2013 and May 2013, concerning the claims with Standard, Dweck clearly refers to O'Brien as "my attorney" and "our counsel." See Exhs. M & N to Lamatina Decl. For example, one such email exchange in May 2013 reflects that Lamatina and Standard's attorneys were negotiating for the release of the proof of loss amounts, "while we litigate the other issues[.]" Id. Exh. M. Lamatina needed information from Dweck regarding certain of the policies, which listed BRT Realty as the mortgagee. Id. Dweck responded: "We refinanced brt in 2007. So they are no longer relevant. Who should I contact to resolve this? Chernoff or my attorney or brt?" Id. In another email exchange, Lamatina, Dweck, and others discussed the insurance claims and the division of responsibilities between the Sponsor and the Association, in the context of answering questions from the prospective purchaser of a condominium unit. In that email exchange, on May 31, 2013, Dweck told Lamatina: "We (through our counsel) have replied to the purchaser in detail with respect to their questions and concerns regarding the unit. We need the association to answer their questions about the common areas. . . ." Id. Exh. N.

The movants argue that these emails are not relevant for purposes of deciding this motion because O'Brien was not acting as Dweck's attorney in the context of this current litigation. Reply Br. at 11-13. There are two problems with this argument, however. First, it is inconsistent with the division of responsibilities that Dweck appears to have drawn in his May 31, 2013 email to Lamatina. In that email, Dweck explained that the Sponsor had already resolved the questions regarding the unit itself, but needed the Association, through Lamatina, to respond concerning the common areas. See Exh. N to Lamatina Decl. Second, that O'Brien was acting as Dweck's advocate is clear from emails dated from January 2013, when O'Brien, Lamatina, Dweck and other Association members discussed the upcoming March 2013 Board of Directors election. Indeed, O'Brien offered his comments regarding issues as to how the vote would proceed. See Exh. J to Lamatina Decl. These emails support the conclusion that Dweck viewed O'Brien as his personal attorney, and Lamatina as counsel for the Association. O'Brien took an active role in protecting Dweck's interests in the March 2013 Board of Directors election. Moreover, even when issues concerning the extent of insurance coverage and the pending litigation arose, Dweck's emails reflect his own belief that O'Brien was his personal attorney. Therefore, the Court concludes that the movants have failed to satisfy either prong of the two step analysis in Montgomery Academy, 50 F. Supp. 2d at 351, as the movants have failed to prove (1) Dweck submitted confidential information to Lamatina in this litigation and that (2) Dweck possessed a reasonable belief that Lamatina was acting as his attorney in this litigation.

### b. Disqualification Based on RPC 1.8(i) and 1.7(a)(2)

The movants next argue that Lamatina should be disqualified because his family's company, Bay Point Investments, LLC, "owns ten of the condominium units of the Residences and will receive a portion of the eventual proceeds of this litigation allocable to the units he owns."

<u>See</u> Moving Br. at 23-24, D.E. 44-2. The movants assert that Lamatina's ownership of the condominium units violates RPC 1.8(i), which states:

> A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may: (1) acquire a lien granted by law to secure the lawyer's fee or expenses, (2) contract with a client for a reasonable contingent fee in a civil case.

The movants also claim that Lamatina's representation would violate RPC 1.7(a)(2).[8] That rule states in relevant part: "[A] lawyer shall not represent a client if the representation involves a current conflict of interest. A concurrent conflict of interest exists if…there is a significant risk that the representation of one or more clients will be materially limited…by a personal interest of the lawyer."

The movants allege that Lamatina's personal financial interest in the outcome of this litigation, which could include both money for damages to his individual condominium units and his 25% contingent attorney fee, "outweighs that of the Association and that of any other condominium unit owner whose unit sustained flood damage in Hurricane Sandy." Sponsors' Supplemental Br. at 1, D.E. 75. The movants argue that this financial interest "creates an inherent conflict of interest and materially limits his ability to apply independent professional judgment to this litigation on plaintiff's behalf." <u>Id.</u> For example, the movants argue that Lamatina's financial interest could affect the fairness of a settlement agreement because Lamatina might try to skew a settlement in his favor so that his units ultimately recover more than their fair share of the settlement. Chernoff Supplemental Br. at 16, D.E. 74.

---

[8] Neither of the movant's original briefs discussed RPC 1.7(a)(2). The movants raised it, for the first time, at oral argument. The Court allowed the parties to include discussion of RPC 1.7(a)(2) in their supplemental briefing. Order, May 12, 2017, D.E. 69.

Lamatina responds that case law does not support the movants' interpretation of RPC 1.8(i). Pl.'s Supplemental Br., D.E. 72.[9] Lamatina also argues that there is no possibility of potentially misallocating settlement proceeds or reaching a settlement that would be more advantageous to his condominium units than to those owned by other Association members. Id. at 12-13. Lamatina explains that a formula has already been calculated for the fair apportionment of any money recovered from a settlement, and that the formula is based on the amount of damages each unit suffered from Superstorm Sandy. Id. Lamatina observes that the Association successfully used this formula in 2013, to allocate funds paid by Standard in partial resolution of the claims. See Supplemental Lamatina Decl., ¶¶ 4-7, 17-20, D.E. 73. The formula was based upon proofs of loss prepared by Standard's independent adjuster, and the work of both the Association's adjuster and Standard's adjuster in assigning dollar values to each damaged item. Id. ¶¶ 8-13 & Exh. F. The Association's Board of Directors approved the formula, and the funds were distributed by an insurance trustee appointed by the Board. Id. As such, Lamatina asserts

---

[9] Lamatina relies principally on European Community v. RJR Nabisco Inc., 134 F. Supp.2d 297 (E.D.N.Y. 2001). But European Community is readily distinguished. In that case, the defendants moved to disqualify plaintiffs' counsel, asserting, inter alia, that the retainer agreements between plaintiffs and their counsel: (1) obligated plaintiffs' counsel to pay all costs and expenses of the litigation, including an investigative firm, without any requirement that plaintiffs repay those expenses absent a recovery; (2) indemnified plaintiffs against any other litigation expenses, including a judgment on any counterclaim or order that plaintiffs pay defendants' attorneys' fees; and (3) provided plaintiffs' counsel exclusive control over certain strategic decisions. Id. at 300-01. The court denied the disqualification motion, but did so based on a standard unique to the Second Circuit. Id. at 303, 308. That standard requires the party seeking disqualification to prove (1) an ethical violation, (2) that will "taint the trial by affecting his or her presentation of a case." Id. at 303 (quoting Bottaro v. Hatton Assocs., 680 F.2d 895, 896 (2d Cir. 1982)). See also id. at 304 ("Unless the 'taint' threshold has been crossed, precedent counsels reliance upon alternatively institutional mechanisms for assessing the ethical propriety vel non of particular instances of questionable attorney conduct."). Plaintiff's counsel has not cited, nor has this Court identified, a decision by the Third Circuit or a District Judge in this District that adopted that standard.

that any future settlement proceeds would be distributed according to a predetermined algorithm beyond his control.

The Sponsors admit that "[t]here is a paucity of law applying [Rule 1.8(i)] in New Jersey." Sponsors' Moving Br. at 23, D.E. 44-2. The Court therefore requested that the parties submit supplemental briefing on the topic, and asked the parties look to jurisdictions outside of New Jersey for any additional guidance on the Rule. See Order, May 12, 2017, D.E. 69. Despite this opportunity, the movants have failed to cite to any case which stands for the proposition that an attorney in Lamatina's position should be disqualified for his ownership of the condominium units. In fact, many of the cases cited by the movants demonstrate that the prohibition against an attorney having a "proprietary interest in the cause of action or subject matter of litigation" is inapplicable in this circumstance, and does not warrant Lamatina's disqualification.

For example, the movants cite to the case Ankerman v. Mancuso, 271 Conn. 772, 778-79 (2004). In that case, the Supreme Court of Connecticut observed that the prohibition against an attorney acquiring a proprietary interest in the subject matter of litigation "has its basis in common law champerty and maintenance. Champerty is simply a specialized form of maintenance[10] in which the person assisting another's litigation becomes an interested investor because of a promise by the assisted person to repay the investor with a share of any recovery."[11] There is no suggestion

---

[10] Maintenance has been defined as "the intermeddling in a suit by a stranger, one having no privity or concern in the subject matter and standing in no relation of duty to the suitor." In re Resorts Int'l, 145 B.R. 412, 471 (D.N.J. 1990).

[11] In Ankerman, an attorney represented a client in an action involving title to property, and the client executed a promissory note for legal fees owed, which was secured by a mortgage on the property at issue in the title action. 271 Conn. at 774-75. The attorney sought to enforce the promissory note, and the issue before the Supreme Court of Connecticut was whether the attorney had violated Conn. R. Prof. Conduct 1.8(j), which is identical to NJRPC 1.8(i), by obtaining an interest in property that was the subject of litigation. Id. at 776. The court determined that the attorney had not violated the rule because he sought only to enforce the promissory note, and not

that Plaintiff's counsel here has engaged in champterty, or any similar conduct that would form a basis for disqualification under Rule 1.8(i).

The Sponsor Defendants rely on <u>In re Pajerowski</u>, 156 N.J. 509, 513 (1998). There, an attorney was found to have "provided financial assistance to individual clients in connection with their pending or contemplated litigation by advancing sums of money up to the amount he thought would be the net settlement of their particular claim." The New Jersey Supreme Court found that the attorney's loans to his clients violated RPC 1.8(i) because the sums of money advanced resulted in the attorney having a direct "proprietary interest in client's causes of action." <u>Id.</u>

A similar issue arose in <u>Peggy Walz, Inc. v. Liz Wain, Inc.</u>, Civ. No. 94-1579, 1996 U.S. Dist. LEXIS 2294 (S.D.N.Y. Mar. 1, 1996), a case cited in Chernoff's brief. In that case, plaintiff accused the defendant of copyright infringement. Plaintiff's counsel had loaned money to the plaintiff corporation, and the attorney and client agreed that revenues generated by the plaintiff's business, after accounting for salaries and medical insurance, would be devoted to repaying counsel. <u>Id.</u> at *4. Plaintiff's counsel was also a co-principal of the plaintiff corporation. <u>Id.</u> The Court found that the relationship between counsel and plaintiff, in which counsel was both a creditor and a co-principal of the plaintiff corporation, conferred upon counsel a proprietary interest in the plaintiffs' causes of action. <u>Id.</u> at *6.

The other authorities on which the movants rely are no more persuasive. In support of the contention that Lamatina should be disqualified based on RPC 1.7(a)(2), Chernoff cites to the ethics opinion <u>Matter of Berkowitz</u> 136 N.J. 134 (1994), a case in which two partners at a law firm were found to have violated multiple rules of professional conduct for representing clients with

_____

foreclose on the mortgage. <u>Id.</u> at 780-81. The Court concluded that the promissory note alone did not constitute a "proprietary interest in the cause of action or subject matter of the litigation" and therefore, there was no violation of the rule. <u>Id.</u>

adverse interests. One of the attorneys had a personal proprietary interest in his client's business, and that client had interests that were adverse to another client of the firm. Id. at 135. That case is inapplicable to this situation, because any financial interest which Lamatina has in this case is aligned with that of the Association, not adverse to it.[12]

The foregoing cases have interpreted Rule 1.8(i) in contexts where the attorney had become an interested party or investor in the claim itself, such as by becoming their clients' creditors for a sum of money that could potentially be awarded in the litigation. This case poses a different situation, in that Lamatina is not an "interested investor" in the subject matter of this litigation – he has not loaned his client any money that the client agreed to repay with a potential future recovery from the lawsuit. There is no suggestion that if Defendants prevail, the Plaintiff has an outstanding obligation to Lamatina. That is not to say that Lamatina, as a condominium owner, has no interest in the outcome of the litigation. To the contrary, given that his family owns ten of the units, he has a substantial interest in any recovery by the Association. And the Court recognizes that a situation in which an attorney has an interest in their client's potential recovery, might raise ethical concerns. But the circumstances of this case persuade the Court that disqualification is not warranted and, in fact, would pose a considerable risk of prejudice to the Plaintiff.

### c. **Waiver**

First, even if the Court were to determine that disqualification was appropriate based on Rules 1.7, 1.8 or 1.9, the Court would nevertheless deny the motion based on the movants'

---

[12] The Sponsor Defendants also rely on cases standing for the proposition that in class action litigation, an attorney may not act as both a class representative and as counsel for the class "under circumstances where an equitable fund may be created from which an attorneys' fee may be awarded." Sponsors' Supplemental Br. at 9, D.E. 75 (citing Kramer v. Scientific Control Corp., 534 F. 2d 1085, 1090 (3d Cir. 1976)). But the Sponsor Defendants fail to cite to any decision that extended this rule beyond the context of class-action litigation.

extended and unjustified delay in bringing this motion. Lamatina has served as counsel for Plaintiff since the Complaint was first filed in this Court on April 10, 2013. Dweck and the other Sponsor Defendants were added as Defendants in this litigation on January 14, 2014. See Sec. Am. Compl. in 2013 Action. However, no party moved to disqualify Lamatina as counsel during the course of the 2013 Action in federal court. The federal claims in the 2013 Action were dismissed from this Court on August 28, 2014, and because the Court declined to exercise supplemental jurisdiction over the remaining state law claims, including those made against Chernoff and the Sponsor Defendants, Plaintiff re-filed its claims against Chernoff and the Sponsor Defendants in Ocean County Superior Court on September 25, 2014. See Compl., D.E. 1-1. At no point in the course of the Ocean County litigation did any Defendant move to disqualify Lamatina as counsel. The case was removed to this Court on August 23, 2016, and it was not until November 3, 2016 that the Sponsor Defendants indicated their intention to move to disqualify Plaintiff's counsel. See Proposed Joint Discovery Plan at 8, D.E. 30. The present motion to disqualify was filed on January 13, 2017. D.E. 44. Therefore, nearly three years passed between the addition of Dweck as a defendant on January 14, 2014, and when the Sponsor Defendants indicated their intention to move to disqualify Lamatina as counsel on November 3, 2017.

Courts in this Circuit have held that even when a Court has identified a conflict of interest warranting disqualification, "disqualification is not mandatory," when the party seeking disqualification waited a significant amount of time in bringing the motion. Rohm & Haas v. Am Cyanamid Co. 187 F. Supp. 2d 221, 229 (D.N.J. 2001); see also Zimmerman v. Duggan, 81 B.R. 296, 300 (E.D. Pa. 1987). In Alexander v. Primerica Holdings, Inc., the court concluded that "when a former client was concededly aware of the former attorney's representation of an adversary but failed to raise an objection promptly when he has the opportunity," a finding of the

moving party's waiver is justified. 822 F. Supp. 1099, 1115 (D.N.J. 1993). These courts have developed a five-factor balancing test to determine whether the moving party has waived its right to seek disqualification based on delay: "(1) the length of the delay in bringing the motion to disqualify, (2) when the movant learned of the conflict, (3) whether the movant was represented by counsel during the delay, (4) why the delay occurred and (5) whether disqualification would result in prejudice to the non-moving party." Id. (citations omitted).

In this case, the five-factor test weighs in favor of finding that the movants waived their right to seek disqualification of Lamatina. First, the length of the delay weighs decisively against the movants. As stated above, the movants waited two years and eleven months from the time they could have first brought a motion to disqualify. The Chernoff Defendants were involved in this case from the beginning, April 2013, and waited even longer, three years and six months. Courts in this Circuit have found waiver based on undue delay in cases where the movants acted with considerably more expedience than the movants in this case. See Chi Ming Yau v. He Cheng Rest Corp. Civ. No. 12-6754, 2015 WL 3540596 (D.N.J. June 2, 2015) (delay of one year); see also Commonwealth Ins. Co. v. Graphix Hot Line, Inc. 808 F. Supp. 1200, 1208-09 (E.D. Pa. 1992) (delay of two years).

Second, the conflicts alleged by the movants were made known to the movants either before or when each party was named a defendant to the case. As noted, the Chernoff Defendants were named in the original complaint on April 10, 2013. The Sponsor Defendants were added to this action on January 14, 2014. The movants do not contend that they could not raise the disqualification issue in the 2013 Action or before the Ocean County Superior Court because they were unaware of Lamatina's ownership of the units. Instead, they argue that the procedural posture

of the litigation did not afford an opportunity to raise the issue. The Court addresses that issue in its discussion of the fourth factor, below.

The third factor asks whether the movants were represented by counsel during the time of the delay. This factor also weighs in favor of finding a waiver. The Sponsor Defendants have been represented by their current law firm since they were named in the case. The Chernoff Defendants have been represented their current counsel for the entire course of this litigation.

The fourth factor requires the Court to consider any proffered reason for the delay in seeking disqualification. The movants claim that they delayed making the motion because while the litigation was pending in the 2013 Action and in the Ocean County Superior Court, it did not progress in terms of conducting any discovery, and therefore they did not have an opportunity to raise the issue. This argument is unpersuasive. Examination of the record in the 2013 Action alone reveals that movants had ample opportunity to raise the issue. The complaint in that case made clear the Lamatina represented the Plaintiff. Therefore, the Chernoff Defendants could have moved to disqualify in conjunction with their motion to dismiss, which was filed on May 5, 2013. And any of the Defendants, including the Sponsor Defendants, could have raised the issue at any time after the Sponsor Defendants were added in January 2014, and before the District Court dismissed the case on August 28, 2014. Dweck, for example, answered the Complaint on March 31, 2014, and filed a counterclaim against Plaintiff. During that time, there was extensive briefing and motion practice seeking dismissal. Yet none of the movants sought disqualification. In view of the extensive motion practice in that case, movants' assertion that they lacked an opportunity to file the motion rings hollow.

As to the fifth factor, it is evident that the Plaintiff would suffer great prejudice if Lamatina were to be disqualified. Lamatina has served as Plaintiff's counsel for more than four years, has

devoted substantial amounts of time to this complex litigation, and is well familiar with it. This dispute has been in the courts for years, and all parties are entitled to an expedient and efficient resolution. To require Plaintiff to retain new counsel, and allow that new counsel time to become familiar with the complexities and myriad moving pieces in this case, would unduly prolong this litigation even further and cause Plaintiff to incur significant additional legal fees.[13]

Upon consideration of these five factors, the Court finds that the movants have waived their right to seek the disqualification of Lamatina as counsel for Plaintiff. The Court therefore concludes that the movants have failed to carry their "heavy burden" of demonstrating that disqualification is appropriate. See Alexander., 822 F. Supp. at 1114.

### d. Disqualification Based on RPC 3.7

Finally, the movants argue that Lamatina should be disqualified under RPC 3.7 because he is a necessary witness in this case. Moving Br. at 26-27. RPC 3.7 provides that:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>
> (3) disqualification of the lawyer would work substantial hardship on the client.
>
> (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by RPC 1.7 or RPC 1.9.

---

[13] For example, Rules 1.8(i) and 1.7(a)(2) exist to protect the client from an attorney whose divided loyalties compromise his or her ability to effectively represent that client's best interests. Granting disqualification at this late stage would hardly vindicate that purpose.

RPC 3.7 was enacted to prevent a situation where an attorney is forced to act as both an attorney and witness during a trial, thus "creating the danger that the fact finder (particularly if it is a jury) may confuse what is testimony and what is argument, and otherwise creating an unseemly appearance at trial." Main Events Prods., LLC v. Lacy, 220 F. Supp. 2d 353, 357 (D.N.J. 2002). But an attorney's testimony is considered "truly necessary if there are no documents or other witnesses that can be used to introduce the relevant evidence." Oswell v. Morgan Stanley Dean Witter & Co., Inc., 2007 WL 2446529 at *4, Civ. No. 06-5814 (D.N.J. Aug. 22, 2007) (citing J.G. Reis & Sons, Inc. v. Spectraserv, 384 N.J. Super. 216 (App. Div. 2006)). As such, if the attorney in question possesses knowledge "which is equally possessed by other witnesses," disqualification is not required or appropriate. Id.

In this case, the movants argue that Lamatina is a necessary witness because he

would be in the best position to provide information regarding the nature, extent and location of damages which each of these units allegedly suffered, to address questions regarding any pre-existing damages, to testify regarding repairs which were or were not made to those units, to identify the amount spent for any repairs and identify how much of the proceeds from Standard were paid to Mr. Lamatina for those damages.

See Chernoff's Br. in Supp. of Mot. at 3, D.E. 46.

That remains to be seen. At this stage, the movants have not established that there are "no documents or other witnesses that can be used to introduce the same relevant evidence" for which they would call on Lamatina. More importantly, however, New Jersey RPC 3.7(a) "prohibits an attorney who may be a necessary witness from acting as an advocate at trial, but does not prevent representation at the pretrial stage." Truong v. 325 Broadway Assocs. LLC, 557 B.R. 326, 336 (D.N.J. 2016) (emphasis in original). Courts in this District have consistently declined to disqualify counsel based on RPC 3.7, when the motion was brought during the pretrial stage. See e.g., Main Events Prods. v. Lacy, 220 F. Supp. 2d 353 (D.N.J 2002); Tangible Value, Inc v. Town

Sports Int'l Holdings, Inc., Civ. No. 10-1453, 2012 WL 4660865 (D.N.J. Oct. 1, 2012).  Although it is possible that Lamatina's testimony will be required at trial and may prompt disqualification under RPC 3.7, the movants offer no reason to resort to such a drastic measure while the case remains in its pretrial stages and no trial date is set.

III.    **CONCLUSION**

For the foregoing reasons, Defendants' motion to disqualify Louis J. Lamatina, Esq. as counsel for Plaintiff [D.E. 44] pursuant to New Jersey Rules of Professional Conduct 1.7, 1.8(i), and 1.9 is **DENIED.**  Defendants' motion to disqualify Louis J. Lamatina, Esq. pursuant to Rule 3.7 is **DENIED WITHOUT PREJUDICE.**

An appropriate Order accompanies this Opinion.


*s/ Michael A. Hammer*
**UNITED STATES MAGISTRATE JUDGE**


Dated: August 17, 2017